921 F.2d 1101
 30 Wage & Hour Cas. (BN 125, 59 USLW 2463,
117 Lab.Cas. P 35,440
 Russell NICHOLS; Robert Campbell; Jim Walters; Hayden
Byrd; Carl Miller; Loyd McBee; Blake Dudoit,
Plaintiffs-Appellants,
v.
Charles HURLEY, as Sheriff of LeFlore County, Oklahoma; The
Board of County Commissioners of the County of LeFlore,
State of Oklahoma, and The Excise Board of LeFlore County,
Oklahoma, Defendants-Appellees.
and
The Secretary of Labor, Amicus Curiae.
Al COSSEY; Alvin McGee; Jim Lawson, Plaintiffs-Appellants,
v.
Bobby GRAY, Sheriff of McIntosh County, State of Oklahoma;
Board of County Commissioners of McIntosh County,
State of Oklahoma, Defendants-Appellees.
The Secretary of Labor, Amicus Curiae.
 Nos. 89-7033, 89-7080.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 21, 1990.
Rehearing Denied Jan. 29, 1991.
 
 Bill R. Perceful, Pocola, Okl., for plaintiffs-appellants in No. 89-7033.
 Gary R. Buckles, Poteau, Okl., for defendants-appellees in No. 89-7033.
 Jerry G. Thorn, Monica Gallagher, Linda Jan S. Pack, and Ford F. Newman, Washington, D.C., on the brief for amicus curiae Secretary of Labor in No. 89-7033.
 Mark Green, Green and Green, Muskogee, Okl., for plaintiffs-appellants in No. 89-7080.
 Oliver R. Barris III, Asst. Dist. Atty., (Tom Giulioli, Dist. Atty., with him on the brief), Eufaula, Okl., for defendants-appellees in No. 89-7080.
 Robert P. Davis, Monica Gallagher, Linda Jan S. Pack, and Ford F. Newman, Washington, D.C., on the brief for amicus curiae Secretary of Labor in No. 89-7080.
 Before BALDOCK, BARRETT and EBEL, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiffs-appellants in these two consolidated cases, present or former deputy sheriffs and undersheriffs for LeFlore and McIntosh Counties, Oklahoma, (hereinafter referred to as "deputy sheriffs"), appeal from judgments of the district court granting defendants'-appellees' (collectively hereinafter referred to as "County") motions for summary judgments in the deputy sheriffs' actions seeking compensation for overtime pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. Secs. 207, 216. County's motion for summary judgment was grounded on the contention, adopted by the district court, that the deputy sheriffs were not covered "employees" as that term is defined by the FSLA:(C) any individual employed by a State, political subdivision of a State, or an interstate governmental agency, other than such individual--
 
 
 2
 (i) who is not subject to the civil service laws of the State, political subdivision, or agency which employs him; and
 
 
 3
 (ii) who--
 
 
 4
 (I) holds a public elective office of that State, political subdivision, or agency,
 
 
 5
 (II) is selected by the holder of such an office to be a member of his personal staff,
 
 
 6
 (III) is appointed by such an officeholder to serve on a policy making level, or
 
 
 7
 (IV) who is an immediate adviser to such an officeholder with respect to the constitutional or legal powers of his office.
 
 
 8
 Id. at Sec. 203(e)(2)(C).
 
 
 9
 On appeal, deputy sheriffs assert that the district court erroneously granted summary judgment in favor of County, challenging the district court's conclusion that deputy sheriffs are excepted from FLSA's definition of "employee" because a person holding that position in Oklahoma would be a member of the elected sheriff's "personal staff." For the reasons stated below, the judgment of the district court is affirmed.
 
 
 10
 We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the district court. Abercrombie v. City of Catoosa, 896 F.2d 1228, 1230 (10th Cir.1990).
 
 Background
 
 11
 The FLSA provides for a number of exceptions from its minimum wage and overtime compensation requirements, as well as from its overtime pay provisions. Until 1974, employees of a state or political subdivision were covered only if employed in a hospital, nursing home, school or in the operation of a railway or carrier. The 1974 amendments provided coverage for most state and political subdivision employees. 29 U.S.C. Sec. 203(d), (e)(2), (x). Exemptions from the FLSA are to be narrowly construed in favor of the employees. Brennan v. Dillion, 483 F.2d 1334 (10th Cir.1973).
 
 
 12
 The FLSA does not define the term "personal staff." The Secretary of Labor has promulgated a regulation which provides:
 
 
 13
 The statutory term 'member of personal staff' generally includes only persons who are under the direct supervision of the selecting official and have regular contact with such official. The term typically does not include individuals who are directly supervised by someone other than the elected official even though they may have been selected by the official.
 
 
 14
 29 C.F.R. Sec. 553.11(b).
 
 
 15
 Inasmuch as the definition of "employee" under the FLSA is essentially identical to that under Title VII, see 42 U.S.C. Sec. 2000e(f)[1], we may look to both the legislative history of Title VII and cases interpretive of the "personal staff" exception under Title VII for guidance. See Brewster v. Barnes, 788 F.2d 985, 990 and n. 7 (4th Cir.1986).
 
 
 16
 In Owens v. Rush, 654 F.2d 1370 (10th Cir.1981), we addressed the "personal staff" exception in a Title VII suit brought by a Kansas undersheriff. This court began its analysis with the following general propositions:
 
 
 17
 [T]he scope of the 'personal staff' exception is governed by federal rather than state law which is only 'relevant insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised and fired.' Furthermore, the provisions of Title VII do not provide a statutory definition for the term 'personal staff.' Under these circumstances courts generally interpret the words in accordance with their ordinary, everyday meaning, absent some contrary indication in the legislative history.
 
 
 18
 The legislative history of Sec. 2000e(f) indicates that Congress intended that the personal staff exception be construed narrowly....
 
 
 19
 Thus it would appear that Congress intended for the personal staff exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official.
 
 
 20
 Id. at 1375 (citations and footnote omitted).
 
 
 21
 Other courts have followed the same general propositions in interpreting Title VII's "personal staff" exception. See, Teneyuca v. Bexar County, 767 F.2d 148, 150 (5th Cir.1985); Curl v. Reavis, 740 F.2d 1323, 1327-28 (4th Cir.1984).
 
 
 22
 In Owens, supra, this court "looked to the nature and circumstances of the employment relationship between the complaining individual and the elected official to see if the exception applie[d]," and concluded: "Considering the nature of the Undersheriff's position and the close working relationship required to perform effectively in the position, we must conclude that plaintiff was in the type of job which Congress intended to be within the personal staff exception of Sec. 2000e(f) and thus outside Title VII coverage." 654 F.2d at 1375, 1376-77.
 
 
 23
 The specific factors relied upon by the Owens court included the following:
 
 
 24
 The Undersheriff serves at the pleasure of his superior, the County Sheriff, who has plenary power of appointment and removal. See Kan. Stat. Secs. 19-803, 805, 805c. The fact that state law permits the Sheriff to have this power shows that the state intends for the Undersheriff to be personally accountable only to one public official. Such a level of personal accountability is reasonable since the Sheriff is both politically and civilly liable for any default or misconduct of the Undersheriff in the performance of his official duties. Id. Secs. 19-801a, -804 to 805, -811 to 813, -816 to 817.
 
 
 25
 Id. at 1376. In addition to these factors, the court noted that the undersheriff testified he had " 'a very close working relationship with the sheriff' " which, the court concluded, undoubtedly was necessary since the undersheriff "was 'second in authority under the sheriff' and acted on behalf of the sheriff when he was not available or present." Id. The court further noted that by state law, in the event of a vacancy in the office of sheriff, the undersheriff would serve in his place and the sheriff's estate or bonding company would remain liable for the acts of the undersheriff in the performance of his official duties. Id.
 
 
 26
 In addition to the legislative history of Title VII, the Owens court relied primarily on the opinions from two other courts in analyzing the personal staff exception: Ramirez v. San Mateo County Dist. Attorney's Office, 639 F.2d 509 (9th Cir.1981), and Wall v. Coleman, 393 F.Supp. 826 (S.D.Ga.1975). In Ramirez, the court considered whether a deputy district attorney was a member of the district attorney's personal staff. The court noted that by law, the deputies were not protected by civil service, and they served at the will and pleasure of the district attorney, an elected official with plenary power to hire and fire. Id. at 512. The Ninth Circuit, like this court in Owens, then examined what these legislatively defined factors indicated about the working relationship that the particular government envisioned would exist between the elected official and the plaintiff:
 
 
 27
 The exclusive powers of selection and retention indicate that deputies perform to the district attorney's personal satisfaction rather than to the more generalized standards applied to other county workers by the civil service system. Such a level of personal accountability is consistent with the highly sensitive and confidential nature of the work which the deputies perform as well as with the considerable powers of the deputy to represent the district attorney in legal proceedings in the eyes of the public.
 
 
 28
 Id. at 513. The court concluded that "when a job includes this level of personal accountability to one elected official, it is precisely the sort of job Congress envisioned to be within the 'personal staff' of that official and thus exempt from Title VII." Id.[2]
 
 
 29
 In Wall, the court also considered whether an assistant district attorney fell within the personal staff exception. The court first looked to the dictionary meaning of "personal" to divine the ordinary meaning of "personal staff." 393 F.Supp. at 829. One of the definitions of "personal" was " 'of or pertaining to a particular person.' " Id. (quoting Webster's New International Dictionary, (2d Ed. Unabridged)). The court then discussed the fact that when the district attorney runs for reelection, he suggests to the electorate that he should be reelected because he has done a good job in the past, and that the electorate's impression of the job he has done is influenced in large part by the performance of his assistant deputy district attorneys. Id. at 830-31.
 
 
 30
 Finally, the court noted that the assistant district attorneys are "the persons who can do all that the district attorney himself can do," and concluded:
 
 
 31
 That the assistants appointed by District Attorney Ryan do what he delegates to them, serve at his pleasure and work as his assistants instead of working as assistants for all district attorneys of this state or the superior court or the Attorney General of Georgia, further demonstrates that their position as an assistant is 'of or pertaining to a particular person'--Mr. Ryan. They each represent him in everything they do as an assistant district attorney. A more personal relationship would be hard to create.
 
 
 32
 Id. at 831.
 
 
 33
 In a series of cases, the Fourth Circuit has considered whether various positions within a sheriff's department fall within the personal staff exception, and in each instance has concluded that the position does not. The first case involved a female deputy sheriff who worked as a dispatcher-matron, then a records clerk, and then a secretary. She sought and was denied positions as a road deputy and a detective, and later was fired. Curl v. Reavis, 740 F.2d at 1325. The plaintiff brought suit for sex discrimination under Title VII, and the court, after a trial to the bench, entered judgment in her favor. The defendants appealed, asserting that the plaintiff was not an "employee" under Title VII. Id. at 1324-25.
 
 
 34
 The court began its analysis by noting that the only exception to the definition of an employee at issue was that for personal staff "[s]ince a North Carolina deputy sheriff is not an elected official, and there is no evidence whatsoever that plaintiff was ever called upon to make policy for the Sheriff's Department or to act as an immediate adviser to the Sheriff with respect to his constitutional or legal powers." Id. at 1328.
 
 The court continued:
 
 35
 Whether Curl is to be treated as a member of the Sheriff's personal staff requires a careful examination of the nature and circumstances of her role in the Sheriff's Department. Though Curl, like all deputies, served at the pleasure of the Sheriff, her position was created and her compensation paid by the county pursuant to state law. There is no evidence that her working relationship with Sheriff Reavis was "highly intimate and sensitive." She was not under his personal direction, and she brought her promotion requests before his subordinate. Curl did not occupy a high position within the chain of command, and her duties were primarily clerical and secretarial.... We cannot conclude that Curl was a member of the Sheriff's personal staff....
 
 
 36
 Id. (citations omitted).
 
 
 37
 In the next two cases, the Fourth Circuit mixed into its analysis of the personal staff exception elements from two of the other exceptions: people appointed by an officeholder to serve on a policymaking level and immediate advisers to an officeholder with respect to the constitutional or legal powers of his office.
 
 
 38
 In Brewster v. Barnes, supra, the plaintiff brought claims under Title VII and the Equal Pay Act, as well as 42 U.S.C. Sec. 1983. The district court ruled in favor of defendants under Title VII on the ground that they were not guilty of intentional discrimination, and ruled that the plaintiff could not recover under the Equal Pay Act because she was a member of the sheriff's personal staff and, therefore, not an "employee" under that act. 788 F.2d at 989.
 
 
 39
 From 1968 to 1974, the plaintiff performed primarily secretarial work for the sheriff. In early 1974, she began working as substitute matron for the female and juvenile prisoners in the jail, but continued to be primarily the sheriff's secretary. In the spring of 1974, the plaintiff completed Correctional Officers Training School with some male deputies and began performing primarily correctional officer duties. The plaintiff continued some of her secretarial duties for the sheriff until September of 1975, when he moved his office out of the jail and hired a full time secretary. Thereafter, the plaintiff spent all of her time performing the duties of a correctional officer. Id. at 987-88.
 
 
 40
 In order for a deputy to receive the salary of a correctional officer, the sheriff and the County Board of Supervisors each had to certify to the Compensation Board that the deputy spent more than fifty percent of his or her time performing the duties of a correctional officer. The sheriff first certified the plaintiff for payment as a correctional officer in June of 1974, and thereafter certified her in March of 1975, March of 1976, and July of 1977. The Board of Supervisors, however, refused to certify the plaintiff until July of 1977. The Compensation Board agreed to pay the plaintiff the salary of a correctional officer effective July 1, 1977, but as a result, plaintiff's salary was significantly less that those of male correctional officers who were certified in 1975. Id.
 
 
 41
 The Fourth Circuit noted that statutorily, there was no significant difference between the relationship of sheriffs and deputies in Brewster and in Curl: the sheriff had the authority to hire, fire, and supervise his deputies; the deputies could " 'discharge any of the official duties of their principal;' " and state courts had described the deputies as " 'one and the same as the sheriff.' " 788 F.2d at 990 (citations omitted).
 
 
 42
 The time frame the court considered was that from 1975 to 1979, when the plaintiff left the sheriff's department. Id. The court evaluated the application of the personal staff exception as follows:
 
 
 43
 [A]ny close working relationship which existed between Brewster and Shockley prior to 1975 had essentially ended once Shockley moved his office out of the jail, while Brewster remained behind as a full-time correctional officer. From 1975 to 1979 Brewster ... did not occupy an intimate or high level position in the Sheriff's Department, nor did she make policy decisions. Rather, she performed the same functions as the other correctional officers at the jail: handling, transporting, and supervising prisoners; searching visitors; and various jobs such as recordkeeping, cooking, and cleaning. In short, under the rationale of Curl, Brewster was not a member of Shockley's personal staff.
 
 
 44
 Id. at 990-91 (emphasis added).
 
 
 45
 In United States v. Gregory, 818 F.2d 1114 (4th Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), (Gregory II ), the government brought suit against the Sheriff of Patrick County, Virginia, for violating Title VII by failing to employ women in certain deputy positions. "Patrick County is a sparsely populated, rural county, with a relatively large land area. The sheriff is elected, and his department consist of twenty-three individuals, including 'sworn officers' or deputies." Id. at 1115. The eighteen deputies in the department were divided into seven different classes: supervisor (2); investigator (2); road deputy (4); court security officer (2); correctional officer (5); process server (1); and "clerk-steno" matron (2). Id.
 
 
 46
 The district court had concluded that the road deputy position was a personal staff position but that the correctional officer and courtroom security officer positions were not. Id. at 1116. The basis for the district court's ruling with respect to the road deputy position was that a road deputy "is the 'alter-ego and personification of the sheriff in the geographical area to which he is assigned.... They are the eyes and ears of the sheriff, not only for matters which fall within their official sphere but also as to matters political.' " Id.
 
 
 47
 In evaluating the district court's conclusion with respect to road deputies, the Fourth Circuit looked at its earlier precedent in Curl and Brewster. Of its decision in Curl, the court said:
 
 
 48
 The opinion lists many reasons for the finding [that the plaintiff was not on the personal staff]: (1) the plaintiff was not called upon to make policy for the sheriff's department, nor to act as an immediate advisor to the sheriff with respect to his constitutional or legal powers; (2) Congress intended for the exemption to be construed narrowly, to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official; (3) the plaintiff's position was created and compensated by the county pursuant to state law; (4) her working relationship with the sheriff was never 'highly intimate or sensitive;' (5) she did not occupy a high position within the chain of command, and her duties were primarily clerical and secretarial; and (6) she was not under the sheriff's direction.
 
 
 49
 Id. at 1117 (emphasis added).
 
 
 50
 The court also commented on its decision in Brewster, saying:
 
 
 51
 We concluded that the close relationship which had formerly existed had ended once the plaintiff assumed the position at the jail. Thus, because the plaintiff did not occupy an intimate or high level position, and because she did not render advice in formulating policy decisions, she was not a member of the sheriff's personal staff.
 
 
 52
 Id. at 1117 (emphasis added).
 
 
 53
 Applying the rationale of these two cases to the one before it, the Fourth Circuit concluded:
 
 
 54
 [W]e cannot say as a matter of law that the deputy position falls within the personal staff exception to the coverage of Title VII. The road deputies in Patrick County function primarily as typical policeman [sic] who administer the laws and 'policies' of their supervisors. There is no evidence that the road deputies are called upon to render advice to the sheriff respecting his policy decisions or the proper exercise of his powers. The road deputy position in Patrick County is not one high within the chain of command, nor do these road deputies occupy a highly intimate and sensitive status vis-a-vis the sheriff. The fact that Patrick County is rural and concomitantly employs a rather small police staff does not by itself render the position of road deputy within the sheriff's personal staff. Although we could assume that, with a small deputy contingent, the relationship between the deputies and the sheriff might be close, the appellee has simply failed to show that that closeness has engendered a highly intimate relationship which influences the making of policy.
 
 
 55
 Id. (emphasis added).
 
 
 56
 Plaintiffs in the two cases at issue here, as well as the Secretary of Labor, urge this court to adopt the reasoning of Gregory II and conclude that plaintiffs were not members of the sheriff's personal staff. In particular, they rely on the statements in Gregory II about the deputies not making policy or giving advice to the sheriff. We decline to adopt the Gregory II reasoning. In our view, these are factors that concern two other exceptions to the definition of employee, not the personal staff exception.
 
 
 57
 With respect to employees of states or political subdivisions thereof, four separate categories of people are not covered by Title VII or the FLSA: (1) people who are elected officials; (2) people who are chosen by an elected official to be on his personal staff; (3) people who are appointed by an elected official on a policymaking level; and (4) people who are immediate advisers to an elected official regarding his constitutional or legal powers. Thus, a person can be a member of an elected official's personal staff and not be either a policymaker or an immediate adviser with respect to the constitutional and legal powers of the elected official.
 
 
 58
 When this court determined that the undersheriff in Owens was on the sheriff's personal staff, it did not suggest that the undersheriff either had to participate in making policy within the sheriff's department or give advice to the sheriff. In fact, it is hard to envision anyone who would be on a sheriff's personal staff and would constitute an immediate adviser with respect to the sheriff's constitutional and legal powers, since such a position would, presumably, be held by an attorney.
 
 
 59
 This court addressed the policymaker and immediate adviser exceptions under Title VII in Anderson v. City of Albuquerque, 690 F.2d 796 (10th Cir.1982), which involved a suit by a former city employee who was denied the position of staff director of the city's Human Rights Board. In evaluating whether the staff director position qualified as an immediate adviser with respect to the constitutional and legal powers of the office of mayor, this court said: "The staff director is not required to have a law degree, and is not attached to the City's legal office.... In general, the staff director deals primarily with the other appointees who are themselves advisors to the mayor. Direct interaction between the mayor and the director is minimal." Id. at 801.
 
 
 60
 Although Anderson did not concern the personal staff exception, this court recently cited Anderson's conclusion that "the staff director does not formulate policy or advise the mayor so as to create the immediate and personal relationship required by the exception," id., in a case concerning the personal staff exception. In Starrett v. Wadley, 876 F.2d 808, 820-22 (10th Cir.1989), this court considered whether a deputy assessor was a member of the County Assessor's personal staff, and thus exempt from the protections of Title VII. The district court had concluded that the plaintiff was a member of the personal staff, noting that the "plaintiff was under Wadley's supervision, she worked closely with Wadley, Wadley could terminate her at will, Wadley periodically would accompany her in her field assessment work, and she often reported directly to Wadley." Id. at 821.
 
 
 61
 After discussing the legislative history of the personal staff exception, this court made the following observations:
 
 
 62
 [P]laintiff was one of several lower-level deputies in the County Assessor's office. The record reveals that plaintiff's salary was approximately $10,000 per year. Oklahoma law required Wadley to appoint a 'first or chief deputy' to act for him in his absence, and he did so. But that person was not plaintiff. Most important, Wadley himself testified that plaintiff worked as one of the office's 'field personnel' and was not a close personal adviser to him....
 
 
 63
 Id. The court concluded: "Based upon our review of the record, we conclude that plaintiff did not 'formulate policy or advise [Wadley] so as to create the immediate and personal relationship' that is required for the 'narrow exemption intended by Congress.' " Id. at 822 (quoting Anderson, 690 F.2d at 801).
 
 
 64
 While Starrett suggests that the policymaking and advice-giving elements are decisive factors in the personal staff exception, such was not necessary to the court's opinion because there was no evidence equating the "field personnel" assessment work of Deputy Starrett to that of the undersheriff in Owens or the deputy sheriffs in the instant case. Deputy Starrett was not vested with that degree of authority rendering her work highly sensitive and personal in terms of Assessor Wadley's accountability and liability. Furthermore, there is nothing indicating that any actions of Deputy Starrett could have the political impact that false arrests or unlawful searches and seizures committed by deputy sheriffs would have on a sheriff.
 
 
 65
 Prior to the appeal in Gregory II, the district court in that case looked to the state law and noted that it requires "a high degree of accountability between a sheriff and deputy [which] 'equates with the confidential relationship of a sheriff deputy's employment.' ... [S]uch accountability raises the public's view of deputies as representatives of the sheriff thereby increasing the necessity for loyalty in that position." United States v. Gregory, 582 F.Supp. 1319, 1321 (W.D.Va.1984), rev'd, 818 F.2d 1114 (4th Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987) (citation omitted) (Gregory I ). The court continued:
 
 
 66
 Moreover, being an elected official, the sheriff must depend on his deputies to be his eyes and ears as to public sentiment and opinion. Unofficially, it is the deputy's job to know what is going on in his assigned area of the county that might affect the sheriff favorably or adversely in the eyes of the voting public....
 
 
 67
 [F]or a deputy's assigned area of the county, he is the sheriff and the problems, complaints, etc. which must be dealt with by the Sheriff in the geographic area of the County are brought to the deputy initially.[3]
 
 
 68
 Id. at 1321-22.
 
 
 69
 The Fifth Circuit, in deciding a first amendment case in which the incoming sheriff failed to rehire various deputies from the prior sheriff's administration, examined the relationship between deputies and sheriffs in "the small county situation." McBee v. Jim Hogg County, 703 F.2d 834, 839-42 (5th Cir.1983), vacated and remanded on other grounds on reh'g en banc, 730 F.2d 1009 (5th Cir.1984).
 
 
 70
 The deputy sheriff in a small county, unlike one of some 550 assistants in a larger county [Dallas County], possesses a much more significant role in the community as a member of law enforcement.... [T]he small county deputy performs virtually all the duties attendant to the actual duties of the sheriff himself. His functions are highly discretionary and more than "the simple exercise of ministerial competence." Each of his actions, as varied as they may be, represent the implementation of policies of the sheriff's department as a whole.
 
 
 71
 * * * * * *
 
 
 72
 In the small county situation, the need for confidence in one's employees is heightened since an official must rely on perhaps six, as opposed to six hundred, officials to carry out his objectives. Such is even more apparent in the law enforcement area where a sheriff's deputies are often called upon to make on-the-spot split-second decisions effectuating the objectives of the law enforcement policies which a particular sheriff has chosen to pursue. The need for confidence and loyalty in one's employees--particularly where so few are involved in a position of heightened public scrutiny--is paramount.
 
 
 73
 Where employees serve at the pleasure of a public official, a high level of personal accountability to that official can be presumed. This high level of personal accountability is 'consistent with the highly sensitive and confidential nature of the work which the deputies perform as well as with the considerable powers of the deputy to represent the [official] in the eyes of the public.' Thus, a high degree of accountability ... equates with the confidential relationship of a sheriff deputy's employment. Furthermore, such accountability raises the public's view of deputies as representatives of the sheriff.... These matters are exacerbated in the small county situation where only six deputies are employed to account to the sheriff and represent him publicly.
 
 
 74
 Id. at 839-40 (citations omitted).
 
 
 75
 In summary, we believe that the nonexhaustive list of factors to be considered in evaluating the "personal staff" exception were well articulated in Teneyuca v. Bexar County, supra, to-wit:
 
 
 76
 (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.
 
 
 77
 767 F.2d at 151. These factors can be measured rather objectively with the exception of the last factor. Owens had this same mix of objective and subjective factors. It is the last, subjective factor that plaintiffs and the Secretary of Labor here contend to be controlling.
 
 Facts, Analysis and Disposition
 
 78
 The record in No. 89-7080, Cossey v. Gray, is not as well developed as that in No. 89-7033, Nichols v. Hurley. However, beginning with the statutorily determined factors, which are common to both cases, both records show that the sheriff has plenary powers over the appointment and removal of his undersheriff and deputy sheriffs, Okla. Stat. tit. 19, Sec. 548; the undersheriff and deputy sheriffs serve at the pleasure of the sheriff, id. at Sec. 547; the sheriff is responsible for the acts of his undersheriff and deputy sheriffs, id. at Secs. 513, 519, 545, 547[4]; the undersheriff and deputy sheriffs have the same duties and powers as peace officers as does the sheriff, id. at Sec. 516; and the undersheriff and deputy sheriffs have the same duties and powers with respect to serving process issued out of the district courts as does the sheriff, id. at Sec. 545.
 
 
 79
 Both Sheriff Gray and Sheriff Hurley submitted affidavits in support of their respective motions for summary judgment. They averred that they hired the respective plaintiffs as deputies to carry out the duties of the sheriff's office within a particular geographical area within the county. Both averred that they gave plaintiffs broad discretion in exercising those duties, and that plaintiffs were directly accountable only to the sheriff in carrying out those duties.
 
 No. 89-7080, Cossey v. Gray
 
 80
 Each of the plaintiffs in Cossey submitted an affidavit in response to summary judgment that averred he was not consulted about policy decisions, he was not privy to sensitive information of the office other than that which related to the cases on which he was working, he was not an adviser to the sheriff, and he had never been an undersheriff.
 
 
 81
 Applying the Teneyuca factors to plaintiffs in Cossey, we see that Sheriff Gray had plenary powers of appointment and removal, and plaintiffs were accountable only to Sheriff Gray. Plaintiffs represented Sheriff Gray in the eyes of the public inasmuch as they essentially were the sheriff in their respective geographical areas. See McBee, 703 F.2d at 839-40; Gregory I, 582 F.Supp. at 1321. As to Sheriff Gray's exercise of control over plaintiffs' positions, while he gave plaintiffs broad discretion in carrying out their duties, he certainly had ultimate control over their positions since they served at his pleasure and his will. The record does not reveal plaintiffs' position within the chain of command.
 
 
 82
 The record is rather sparse concerning the final factor: the actual intimacy of plaintiffs' working relationship with Sheriff Gray. Although plaintiffs averred they did not assist Sheriff Gray in making policy decisions or act as his advisers (factors not pertinent to the personal staff exception), nonetheless they were privy to sensitive information concerning the cases on which they worked. In McBee, the court reasoned, as do we, that one can assume a certain level of intimacy from the nature of a deputy sheriff's role in a small county. 703 F.2d at 839-40. In Owens, this court concluded that a high level of personal accountability could be implied from the fact that the plaintiff served at the pleasure of the sheriff, who had plenary powers of appointment and removal, and who was liable for any default or misconduct by the plaintiff in the performance of his duties. 654 F.2d at 1376. Other courts have held that a high level of personal accountability equates with a confidential relationship that falls within the personal staff exception. See Ramirez, 639 F.2d at 513; Wall, 393 F.Supp. at 831.
 
 
 83
 Ultimately, the procedural posture of this case controls the outcome. Defendants moved for summary judgment against plaintiffs and came forward with both the statutory provisions and the averments in Sheriff Gray's affidavit set forth above. In response, plaintiffs submitted only the averments from their affidavits set forth above. In Teneyuca, when the defendant's evidence on the first three or four factors indicated that the personal staff exception should apply, the court held that such a showing was sufficient to shift the burden to the plaintiff to demonstrate that a material issue of fact existed as to the true nature of her relationship with the elected official in question, i.e., that it was in fact other than that implied by the defendant's evidence. 767 F.2d at 152. When the plaintiff failed to make a sufficient showing of an issue of material fact, the court ruled that summary judgment for the defendant was appropriate. Id. at 153.
 
 
 84
 Here, defendants made a sufficient showing with respect to the first four Teneyuca factors to demonstrate that Sheriff Gray and plaintiffs had the type of relationship subject to the personal staff exception. It was then plaintiffs' burden to demonstrate that a material issue of fact existed as to whether their relationship with the sheriff actually was such as to fall within the exception. In our view, plaintiffs' affidavits failed to create such a material issue of fact. We hold that the district court did not err in entering summary judgment in favor of defendants.
 
 No. 89-7033, Nichols v. Hurley
 
 85
 In Nichols, defendants moved for summary judgment in part on the basis of the personal staff exception. In support of their motion, they submitted the depositions of Sheriff Hurley and each of the plaintiffs, as well as Sheriff Hurley's affidavit. The depositions revealed the following pertinent facts. Plaintiffs' salaries were paid by the sheriff's department; Sheriff Hurley submitted a budget request to the County Commissioners and Board of Excise each year, which gave him a lump sum to be used as he saw fit. Sheriff Hurley decided whom to hire and whom to fire; although Deputy Walters fired two people during the time he was undersheriff, it was done at Sheriff Hurley's request.
 
 
 86
 Sheriff Hurley assigned each plaintiff a specific area of the county to cover, and the deputy was on call essentially twenty-four hours a day. The deputies' duties included serving processes, answering calls from the sheriff's office and fellow deputies, and conducting investigations. Deputy Walters testified that the types of cases he was called out on varied from burglaries to barking dogs. Sheriff Hurley had discussions with plaintiffs about how to handle various matters, but most procedures were standardized and he primarily relied upon their training and judgment. Sometimes if an officer were working undercover, he might come across something and obtain a fellow officer to assist him and the Sheriff would not find out about it until later, but as a general rule, Sheriff Hurley knew what his deputies were doing.
 
 
 87
 The Sheriff had policies about the priority of duties. The deputies were to serve civil and criminal papers first and foremost, and were to be available for calls and to answer all calls. Several of the deputies testified that in order to have time to serve their papers, they would not check in on the radio for a period of several hours each week while on duty so that they would not be diverted by having to answer a call. Deputy McBee testified that Sheriff Hurley expected them to do their job and if they just worked eight hours and then went home and refused to answer any calls, they would be in trouble. With respect to calls, Deputy Dudoit testified that the sheriff's office made the decision when a deputy was needed. He further testified that near the end of his tenure with the department, he was getting quite a few calls on his days off so Hayden Byrd made sure he only got called on his day off if it were an emergency.
 
 
 88
 James Walters and Hayden Byrd were both undersheriffs during Sheriff Hurley's tenure. Deputy Walters was undersheriff from January of 1985, when Sheriff Hurley took office, until November 1, 1987. Deputy Byrd then became undersheriff and remained so until December 31, 1988, when Sheriff Hurley left office. Both testified that although they were undersheriffs in name, they were actually just "glorified deputies," and from day one they carried out all the functions of the other "field" deputies. Deputy Walters testified that he supervised the other deputies very little, and Deputy Byrd testified that he had no supervisory capacity and was not involved in Sheriff Hurley's decisions to hire or fire.
 
 
 89
 Each of the plaintiffs discussed his desire to receive overtime compensation with Sheriff Hurley. On one occasion, the Sheriff suggested that Deputy Dudoit talk to a county commissioner about the lack of overtime compensation. Deputy Dudoit testified that when he spoke with the commissioner, his response was that whether the deputy received overtime compensation was up to the Sheriff because the deputy worked for the Sheriff.
 
 
 90
 Applying the Teneyuca factors to the Nichols plaintiffs, we see that Sheriff Hurley had plenary powers of appointment and removal, plaintiffs were accountable only to Sheriff Hurley, and plaintiffs represented Sheriff Hurley in the eyes of the public. Although plaintiffs were given broad discretion in carrying out their duties, they knew what the Sheriff expected of them and attempted to carry out the various policies of the Sheriff. Furthermore, Sheriff Hurley exercised ultimate control over plaintiffs' positions since they served at his pleasure and his will. Although the Sheriff had an undersheriff, the position was one in name only and the undersheriff functioned almost exclusively as a field deputy. Therefore, plaintiffs were directly accountable to the Sheriff, rather than one or more intermediate supervisors. Furthermore, it seems clear that the deputies were employees of the Sheriff, rather than the County.
 
 
 91
 As in Cossey, we believe that the showing by defendants in Nichols was sufficient to shift the burden to plaintiffs to demonstrate that a material issue of fact existed concerning their actual relationship with Sheriff Hurley. See Teneyuca, 767 F.2d at 152. In response to defendants' evidence in support of the motion for summary judgment, plaintiffs each submitted an affidavit. The affidavits of Deputies Walters and Byrd differed from those of the other plaintiffs only in that they made some additional statements regarding their functions as undersheriffs; otherwise, the affidavits were identical. The "field" deputies' affidavits averred the following:
 
 
 92
 (1) They were not in a position to decide whether or not to prosecute crimes; that decision was left strictly to the District Attorney's Office. If there were an error concerning an arrest, search, or other procedure, they were responsible for "answering" to the District Attorney and the Sheriff. (2) The Sheriff did not seek their advice or counsel "regarding operations of the Sheriff's Office on a day to day basis." (3) They "had no intimate and sensitive position of responsibility with the ... Sheriff's Office." They "made no decisions concerning policy" and were not "asked by Sheriff Hurley for [their] advice concerning how to conduct operational assignments." They were merely field deputies, "doing what [they were] told by either Sheriff Hurley or the Undersheriff." (4) While performing their duties in their assigned sectors, they "did not have all the powers of the ... Sheriff." Specifically, they "did not have the power to hire someone; order stepped up patrols in an area; [they] did not have the unequivocated power to order an investigation; [they] did not have the power to buy cars, automobile equipment, or other operational and maintenance equipment for the Sheriff's Office itself." (5) Their "actions were accountable to Sheriff Hurley, his bonding company, the Undersheriff, and the vicarious liability of the LeFlore County, Oklahoma, Board of County Commissioners."
 
 
 93
 The additional averments contained in the undersheriffs' affidavits were as follows. While as undersheriff, Deputy Walters spent "much more than ninety-five percent (95%) of [his] time doing Field deputy work," and Deputy Byrd spent "much more than fifty percent" of his time doing field deputy work. "The position of 'Under Sheriff' of LeFlore County, Oklahoma, is nothing more than a title of being a glorified deputy and only being responsible for the Sheriff's Office when the Sheriff is gone, and otherwise providing leadership and guidance for the field deputies."
 
 
 94
 Deputy Walters also averred that "[o]n those rare occasions when I would make a suggestion Sheriff Hurley would get upset. He thought I was trying to usurp his authority." He further stated: "I never had the type of relationship with Sheriff Hurley an Undersheriff should have. That is I had minimal control over my underlings and was never asked for input regarding operations."
 
 
 95
 Whether plaintiffs' affidavits were sufficient to create a genuine issue of material fact must be evaluated in light of the principle that "conclusory allegations without specific supporting facts have no probative value." Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir.1985).
 
 
 96
 Plaintiffs averred that they had to "answer" to the District Attorney and the Sheriff in the event of an error in an arrest, search, seizure, or the like, and that they were accountable to the Sheriff, his bonding company, the undersheriff, and the vicarious liability of the Board of County Commissioners. In the context of the personal staff exception, being personally accountable to someone other than the elected official means that the employee does not serve solely at the pleasure of the elected official, but of others as well. Although plaintiffs may have been called upon to explain some of their investigative actions to the District Attorney, and while Sheriff Hurley's bonding company and the county commissioners may have been vicariously liable for the acts of plaintiffs in their official capacities, the record does not show that any of these people or organizations had any control or influence over plaintiffs' duties, powers, performance, or actual service. Furthermore, the two men who acted as Sheriff Hurley's undersheriffs said that they had little or no supervisory functions with respect to the other deputies; thus, the field deputies' statement that they were accountable to the undersheriff is contradicted by the undersheriffs themselves.
 
 
 97
 Plaintiffs also averred they were not involved in making policy or giving Sheriff Hurley advice on how to operate the department. These statements do not detract from their status as personal staff, however, inasmuch as they relate to exceptions other than that for personal staff. Furthermore, the function of an elected official's personal staff could be to implement his policies in the manner he desires, rather than help him formulate those policies. Plaintiffs' statement that they "had no intimate and sensitive position of responsibility" is a conclusory statement of the ultimate issue and, by itself, is not sufficient to withstand summary judgment.
 
 
 98
 The fact that plaintiffs did not have the power to hire people, buy equipment or direct the placement of manpower likewise does not detract from their status as personal staff. They need not have the administrative powers of the sheriff to represent him in the eyes of the public or to be in a confidential relationship with him.
 
 
 99
 To the extent that the undersheriffs did run the sheriff's department in Sheriff Hurley's absence, they are like the plaintiff in Owens and clearly are members of Sheriff Hurley's personal staff. The fact that they may have acted as sheriff in Sheriff Hurley's absence does not, however, mean that they acted as an intermediate level of supervision between Sheriff Hurley and the other deputies in his presence. The record shows that for all intents and purposes, the undersheriffs were field deputies like the other plaintiffs, and all were directly accountable to Sheriff Hurley.
 
 
 100
 Like plaintiffs in Cossey, we hold that plaintiffs in Nichols did not make a sufficient showing in opposition to summary judgment to create a genuine issue of material fact. Accordingly, we hold that the district court properly entered summary judgment in favor of defendants.
 
 
 101
 Inasmuch as the district court granted defendants summary judgment on the personal staff issue, it did not reach the other issue presented by defendants' motion for summary judgment: whether plaintiffs' duty to maintain records of their work hours under state law was preempted by the FLSA's requirement that the employer maintain such records. We need not decide the recordkeeping issue.
 
 
 102
 We AFFIRM.
 
 EBEL, Circuit Judge, dissenting:
 
 103
 I respectfully dissent. In my judgment, the district court has misapplied the law, has incorrectly determined that there is no genuine dispute of material fact, and has failed to consider the interpretation of the Fair Labor Standards Act provided by the U.S. Department of Labor. For those three reasons, I would reverse and remand.
 
 
 104
 It is crystal clear from our prior cases interpreting the "personal staff" exception to the Fair Labor Standards Act and the corresponding exception to Title VII of the Civil Rights Act of 1964[1] that the inquiry is an intensely factual one. The preeminent fact to be considered in such interpretations is whether the employee has a "highly intimate and sensitive position of responsibility" and has a "close personal relationship" with the exempt office holder who employs him or her. In Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir.1981) we held that an undersheriff was exempt under the personal staff exception because the undersheriff held an intimate position of responsibility. We observed:
 
 
 105
 "Thus it would appear that Congress intended for the personal staff exception to apply only to those individuals who are in a highly intimate and sensitive positions of responsibility on the staff of the elected official." (Emphasis added).
 
 
 106
 We also observed that the personal staff exception should be "construed narrowly," and that Congress intended it to apply only to those "who are in a close personal relationship and an immediate relationship with [the exempt official]." Id.
 
 
 107
 Our next case was Anderson v. City of Albuquerque, 690 F.2d 796, 800-01 (10th Cir.1982). There, we denied any exemption under Sec. 2000e(f), which includes the personal staff exemption, to the Staff Director of the Human Rights Board because that position was not a policy position nor a position of intimate advisor to the Mayor. Although the "personal staff" exemption was not discussed separately, our decision denied any exempt status under Sec. 2000e(f) to the Staff Director of the Human Rights Board because of a lack of intimacy and policy functions.
 
 
 108
 Our third case was Starrett v. Wadley, 876 F.2d 808, 820-23 (10th Cir.1989). In that case, we rejected a "personal staff" exemption for a Deputy Assessor even though she reported directly to the County Assessor, was his representative to the public, and was hired and dischargeable by the County Assessor. Those facts were not enough to qualify the Deputy Assessor as a member of the County Assessor's staff because she did not occupy a "highly intimate and sensitive position of responsibility" on his staff. Id., quoting, Owens, 654 F.2d at 1375. We concluded that the Deputy Assessor "did not 'formulate policy or advise [the Assessor] so as to create the immediate and personal relationship' that is required for the 'narrow exemption intended by Congress,' [quoting, Anderson, 690 F.2d at 801]." Id. at 822.[2]
 
 
 109
 Other circuits have similarly emphasized the intensely factual nature of the inquiry as to whether a plaintiff falls within the personal staff exemption. Although several of those cases have attempted to enumerate a number of factors to be considered, they all seem finally to anchor their inquiry on whether there was a close personal advisory relationship between the plaintiff and the exempt office holder. A good example of this is found in U.S. v. Gregory, 818 F.2d 1114, 1117 (4th Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), a case factually identical to ours. There, the Fourth Circuit refused to find a personal staff exemption for the deputy sheriff position in a small rural sheriff's office. The district court had found that the deputy sheriff was the "alter ego and personification of the sheriff in the geographical area to which he is assigned." Id. at 1116. Nevertheless, the Fourth Circuit found that the deputy sheriffs were not covered by the personal staff exception because there was no evidence that they were called upon "to render advice to the sheriff respecting his policy decisions." Id. at 1117. The court observed that, although it could assume there was a close relationship between the deputies and the sheriff because it was such a small office, "the appellee has simply failed to show that that closeness has engendered a highly intimate relationship which influences the making of policy." Id. at 1117 (emphasis added).
 
 
 110
 The case of Teneyuca v. Bexar County, 767 F.2d 148 (5th Cir.1985), is another example of a court attempting to enumerate various factors that should be considered in determining whether the personal staff exemption should apply. Although that court enumerated six factors, it did not suggest that all six be accorded equal weight. One of the factors listed was "the actual intimacy of the working relationship between the elected official and the person filling the position." Id. at 151. (Emphasis added.) It is apparent that the court intended this to be the preeminent factor from its discussion of the legislative history which stressed that "this exemption shall be construed narrowly," and from the court's statement that this exception should be reserved for those who are in a "close personal relationship" and "first line advisors" of the exempt elected official. Id. at 152. The court then quoted with approval the Tenth Circuit opinion of Owens v. Rush, 654 F.2d 1370 (10th Cir.1981):
 
 
 111
 "Thus it would appear that Congress intended for the personal staff exemption to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official." Id.
 
 
 112
 The court further observed "that the highly factual nature of the inquiry necessary to the determination of the 'personal staff' exemption does not lend itself well to disposition by summary judgment." Id. Nevertheless, the court approved the granting of summary judgment in that case only because the plaintiffs "wholly failed to present any evidence in response to defendants' [summary judgment] motion." Id. As will be discussed below, the facts in our case are very different as the plaintiffs here have introduced explicit affidavits refuting any inference that they occupied highly sensitive, personal, or policy-making relationships with the sheriff.[3]
 
 
 113
 The district court here wholly failed to address the nature of the relationship of the deputy sheriffs or undersheriffs to the sheriff. The district court based its holdings only on the legally insufficient facts observed that the deputy sheriffs are hired by the sheriff and serve at the sheriff's pleasure and that the sheriff is responsible for their actions. See Starrett v. Wadley, 876 F.2d at 820-22. However, the court failed to address or to make any findings concerning whether there was a "highly intimate and sensitive" relationship between the deputy sheriffs and the sheriff, or whether the deputy sheriffs acted as "personal advisors" to the sheriff, or whether they had a "policy-making" role. If not determinative, these factors are at least the most critical factors in deciding whether a personal staff exemption should be applied. By ignoring these elements, the district court has gone directly against controlling Tenth Circuit authority and has ignored the factors that almost every court in the country has considered to be preeminent in evaluating whether a personal staff exemption applies. Thus, the district court evaluation is deficient as a matter of law.
 
 
 114
 Had the district court considered these factors, it could not have concluded that there was no genuine dispute of material fact as to whether these deputy sheriffs and undersheriffs occupied highly sensitive, intimate, advisory, and policy-making roles with the sheriff. The affidavits submitted by the plaintiffs directly placed those matters at issue as plainly as they could have been disputed. The plaintiffs in the Cossey case submitted affidavits that they were not consulted about policy decisions, were not privy to sensitive information, were not advisors to the sheriff, and had never been undersheriffs. They further averred that they did not assist the sheriff in making policy decisions nor did they act as his advisors. In the Nichols case, the plaintiffs testified by affidavit that they performed strictly routine patrol duties and never presumed to act in a policy-making or advisory role.[4] Even the two plaintiff undersheriffs stated that they were undersheriffs in name only, and were actually just "glorified deputies." They testified they had no supervisory capacity. Here the defendants are in a dilemma, because they seek to emphasize the importance of the undersheriffs, but in doing so they acknowledge an intermediary between the sheriff and the other deputies which makes it even less possible that the deputies could be considered members of the sheriff's personal staff. The district court was unconcerned with that dilemma, however, and simply held all members of the department, deputy sheriffs and undersheriffs alike, were on the personal staff of the sheriff.[5]
 
 
 115
 By virtue of these affidavits, these cases stand in sharp contrast to the situation in Teneyuca where, as pointed out above, the plaintiffs submitted no contradictory evidence to refute the claim that they did not occupy an intimate relationship or close advisory role with the sheriff.
 
 
 116
 The district court has essentially applied a per se rule that all deputy sheriffs are on the personal staff of the sheriff when the office is small because the deputy sheriffs (and the secretaries, dispatcher, and other employees for that matter) inevitably will be hired and dischargeable by the sheriff and will represent the sheriff's office to the public.[6] By ignoring how the deputy sheriffs are, in fact, used in the office, the district court goes contrary to the expressed congressional intent that this exception be "narrowly construed." To dispose of this highly factual issue on summary judgment, especially when there are sharply conflicting affidavits, is simply inappropriate. Thus, not only did the district court fail to consider the proper factors, but had it considered those factors, it could not have granted the defendant's motion for summary judgment. Here I should make it clear that I do not suggest that the defendants may not be able to prove their defense at trial. I am only saying that a fair application of our rules for when it is appropriate to grant summary judgement establishes that summary judgement should not have been granted in these cases.
 
 
 117
 Finally, the Secretary of Labor, in her amicus brief, attached several interpretative opinion letters issued by the Wage and Hour Division of the Department of Labor in which the Department, on facts essentially identical to those presented in these cases, concluded that the deputy sheriffs should not be accorded personal staff exemption status. Because the Wage and Hour Division of the Department of Labor is responsible for applying the Fair Labor Standards Act, its interpretation of the personal staff exemption in that act--through its opinion letters and amicus brief--should be accorded deference. See, e.g., Skidmore v. Swift & Co., 323 U.S. 134, 139-40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); Basic, Inc. v. Levinson, 485 U.S. 224, 239 n. 16, 108 S.Ct. 978, 987 n. 16, 99 L.Ed.2d 194 (1988); Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208, 210 n. 2, cert. denied, --- U.S. ----, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989).
 
 
 118
 For these reasons, I would REVERSE the granting of the appellees' motions for summary judgment and REMAND for further proceedings consistent with the appropriate law.
 
 
 
 [1]
 The term 'employee' means an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a state government, governmental agency or political subdivision (emphasis supplied)
 
 
 [2]
 The relationship between superiors and subordinates also distinguishes the operations of a sheriff's office from those of a police department. For example, the sheriff has broad discretion in appointing his deputies and removing them, which differs from the employment rights usually applying to the members of a police force ... [and] a sheriff, an elected official, is liable for the acts of his deputies ... [whereas] a superintendent of police is [not] liable for the wrongful acts of his subordinates under a derivative or vicarious liability theory. (Footnotes omitted). 70 Am.Jur.2d Sec. 3, p. 226, Sheriffs, Police, and Constables
 A deputy sheriff holds an appointment, as distinguished from an employment. Although he may not be a state or municipal officer within the meaning of constitutional provisions, a deputy sheriff is a public officer under laws which require his appointment by the sheriff ... [and] confer on him powers and duties equal to those of the sheriff himself ... as a public officer, a deputy sheriff has been considered, both under the common and statutory law of one jurisdiction, as the agent of the sheriff, not as an "employee" of the county. [Footnotes omitted]. Id. at Sec. 6, p. 228.
 
 
 [3]
 Analogous to the deputies' power and authority in our case (i.e., to bind the sheriff to discretionary acts performed by the deputies such as false arrests and unlawful searches and seizures) is the exemption provided under the FLSA to "executives" who exercise, customarily and regularly, discretionary powers, 29 C.F.R. Sec. 541.1(d), relating to policy which requires the exercise of independent judgment. 29 C.F.R. Sec. 541.2(b). Such an individual is an "administrative" employee exempt from the wage and hour provisions of the FLSA because he evaluates possible courses of conduct and takes action after considering the various possibilities, free from immediate direction or supervision with respect to matters of significance. 29 C.F.R. Sec. 541.207(a). See 49 Am.Jur.2d Sec. 2325, et seq
 
 
 [4]
 Okla.Stat.Tit. 19, Sec. 547 was amended in 1979 to delete the requirement that the sheriff could appoint only such deputy sheriffs as the board of county commissioners approve
 
 
 [1]
 The "personal staff" exception in the Fair Labor Standards Act is essentially identical to the "personal staff" exception in Title VII, and it is conceded that the exception should receive the same interpretation in both contexts. Brewster v. Barnes, 788 F.2d 985, 990, n. 7 (4th Cir.1986)
 
 
 [2]
 Although the power to formulate policy is not a sine qua non in order to qualify for a personal staff exemption, there is an obvious overlap among the subsections of 29 U.S.C. Sec. 203(e)(2)(C). The absence of any policy making role or immediate advisors role are certainly factors to be considered in deciding whether someone is on the personal staff of an exempt person. Starrett, id.; U.S. v. Gregory, 818 F.2d 1114 (4th Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987)
 
 
 [3]
 Contrary to the way the majority would read Teneyuca, there is absolutely no justification in the statute to suggest a burden shifting halfway through the analysis of whether a claimant falls within the personal staff exemption. Teneyuca was simply a case where the defendants presented substantial evidence that the plaintiff was on the personal staff, and the plaintiff put on absolutely no evidence to the contrary. Thus, the plaintiff lost. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A burden shifting analysis was certainly not necessary to the decision in Teneyuca, nor is it authorized under 29 U.S.C. Sec. 203
 
 
 [4]
 For example, Deputy Nichols stated in his affidavit:
 II.
 As a Field Deputy I was not in a position to decide whether or not to prosecute crimes. That decision was left strictly to the District Attorney's Office and was their decision. I was responsible for answering to the District Attorney in the event some type of error regarding the arrest of a criminal, a search and seizure error, or some type of other difficulty with a case. I would also have to answer to the Sheriff, too.
 III.
 Sheriff Hurley did not ask me how to operate the Sheriff's Office nor did he seek my advice and counsel regarding operations of the Sheriff's Office on a day to day basis. Sheriff Hurley, with the help of his secretary, Sheila O'Neal, handled the budget, caring for the operation and maintenance of the jail, and the day to day operations of the Sheriff's Office.
 IV.
 I had no intimate and sensitive position of responsibility with the LeFlore County, Oklahoma, Sheriff's Office. I made no decisions concerning policy for the LeFlore, County Oklahoma, Sheriff's Office. I was not asked by Sheriff Charles Hurley for my advice concerning how to conduct operational assignments. Accordingly, I had nothing to do with the day to day operations of the LeFlore County, Oklahoma, Sheriff's Office nor in the planning and execution of operational assignments. All those items were handled by the Sheriff or his secretary. I was merely a Field Deputy doing what I was told to do by either Sheriff Hurley or the Undersheriff. I mainly patrolled my assigned sector of LeFlore County, Oklahoma, served criminal warrants, arrested criminals, served civil process, and answered calls from my fellow employee, the LeFlore County, Oklahoma, Sheriff's Office dispatcher. I would assist other LeFlore County, Oklahoma, Law Enforcement agencies when called upon by them for back-up.
 V.
 That while patrolling and acting in my assigned sector I did not have all of the powers of the LeFlore County, Oklahoma, Sheriff. That is to say, I did not have the power to hire someone; order stepped up patrols in an area; I did not have the unequivocated power to order an investigation; I did not have the power to buy cars, automobile equipment, or other operational and maintenance equipment for the Sheriff's Office itself.
 
 
 [5]
 The plaintiffs' affidavits are as detailed as possible when trying to prove a negative. Surely, they are sufficient to establish a genuine dispute of material fact
 
 
 [6]
 Obviously, the mere fact that appellants were not covered by civil service protection does not automatically categorize them as members of a personal staff. See Brewster v. Barnes, 788 F.2d 985, 989-90 (4th Cir.1986); Teneyuca v. Bexar County, 767 F.2d 148, 150-51 (5th Cir.1985)