In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2577

CARLETON HARRIS,

*Plaintiff-Appellant,*

*v.*

ALLEN COUNTY BOARD OF COMMISSIONERS,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:15-CV-217-TLS — **Theresa L. Springmann**, *Chief Judge.*

ARGUED FEBRUARY 16, 2018 — DECIDED MAY 18, 2018

Before WOOD, *Chief Judge*, and KANNE and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Carleton Harris was injured while working at the Allen County Juvenile Center. After he reached maximum medical improvement, both his disability benefits and his employment were terminated. Harris subsequently sued the Allen County Board of Commissioners and the Allen Superior Court for alleged violations of the Americans with Disabilities Act ("the ADA"). The only question on

appeal is whether the Board of Commissioners was Harris's
employer for the purpose of this suit. Because Harris failed to
present adequate evidence to show that it was, the Board of
Commissioners was entitled to summary judgment. Accord-
ingly, we affirm.

## I. BACKGROUND

Indiana law generally authorizes juvenile courts to "estab-
lish juvenile detention and shelter care facilities for children."
Ind. Code § 31-31-8-3(a) (2009); *see also* § 31-31-8-2 (detailing
the criteria for juvenile detention facilities). If the court
chooses to establish the juvenile facility, the judge must ap-
point staff and determine budgets. § 31-31-8-3(c). The county
must pay all expenses for the detention facility from the
county's general funds. § 31-31-8-3(d). Additionally, Indiana
law specifically authorizes the Allen Superior Court to hire
the juvenile facility personnel it believes necessary, and re-
quires that personnel "perform duties as are prescribed by the
court" and "serve at the pleasure of the court." Ind. Code
§ 33-33-2-14(a), (c) (2008).

Under this statutory regime, the Allen Superior Court's
Family Relations Division established the Allen County Juve-
nile Center (first named the Wood Youth Center). Carleton
Harris began working at the facility in 1995. His offer of em-
ployment included the seal of the "Allen Superior Court," and
he signed the Superior Court's Employee Handbook, ac-
knowledging that he entered into an employment relation-
ship with the Superior Court. On the other hand, the job de-
scription for his position bore the seal of the Allen County
Board of Commissioners, and his medical records authoriza-
tion identified the "Allen County Board of Commissioners" as

his employer and the "Wood Youth Center" as his department. During his employment, Harris's discipline was handed down by the Superior Court, and his job performance evaluations listed the "Allen County Juvenile Center" as his department with the title "Allen County Employee Performance Appraisal."

Harris was promoted to the position of a Youth Care Specialist in 2003. It was in this position that he injured his back in September 2013 after being "kicked by a large inmate." Allen County's workers' compensation insurance covered Harris as a Juvenile Center employee, and it included medical treatment, temporary total disability benefits, and permanent partial impairment benefits for his injury. Shortly after he was injured, Harris was contacted by a county employee, Risk Manager/Attorney Charity Murphy, who sent him a form listing the "Allen County Government" as his employer so that he could start collecting workers' compensation benefits.

In May 2014, Harris saw Dr. Kevin Rahn. Dr. Rahn determined that Harris had reached maximum medical improvement and gave Harris work restrictions. Shortly after, Murphy told Harris that his work restrictions prevented him from returning to his Youth Care Specialist position at the Juvenile Center. Murphy began working with Harris to help him find another job. Harris applied for a full-time judicial assistant position at the Superior Court. When he told Murphy that he applied to that position, she told him that she was unaware of the full-time opening. But—she told Harris—she could offer him a part-time judicial assistant position with more money per hour to offset the fact that the position did not come with benefits. Harris turned the job down.

In the meantime, the Indiana Workers' Compensation Board granted Harris's request for an independent medical examination, which was conducted by Dr. Robert Gregori on August 14, 2014. Dr. Gregori reached the same conclusion as Dr. Rahn: that Harris had reached maximum medical improvement and that he needed permanent work restrictions.

After this second diagnosis, Murphy informed Harris by an October 17 letter that the diagnosis terminated his workers' compensation benefits and that his permanent work restrictions prevented him from "perform[ing] the essential functions" of his position at the Juvenile Center, "with or without a reasonable accommodation." (R. 52-1, Murphy Letter, at 43.) He could not return to his position as a Youth Care Specialist. She advised Harris that it was her "responsibility as the [ADA] Coordinator to determine if there [we]re any other job vacancies within Allen County Government that [Harris] could transfer into or apply." (*Id*.) She included a link to currently available jobs and told him to let her know if he wanted to pursue any of the vacancies because she could contact the hiring official to help him get preference for any position for which he qualified. The letter also stated that Harris's "unpaid leave of absence w[ould] end on Monday, October 27, 2014," if he chose not to apply for any vacant positions. (*Id.*) Harris applied to several jobs, but he did not obtain employment.

On October 31, 2014, Harris received a letter from Allen County's insurance manager, informing him that he had not paid his October insurance premium. He had made the payment, so he called the insurance manager. She informed Harris that he didn't need to make any further insurance payments because he had been terminated. Shortly thereafter,

Murphy called Harris and informed him that he "did not qualify for any of the jobs [he] applied for" and "was no longer employed because there were no jobs within [his] restrictions." (R. 52-1, Harris Aff., at 4.)

Harris subsequently filed two charges of discrimination with the Equal Employment Opportunity Commission in March 2015. The Commission issued Harris a right-to-sue letter, and he brought this ADA suit against the Allen Superior Court and the Allen County Board of Commissioners. The Board moved for summary judgment, and the district court granted it, concluding that the Board was not Harris's employer so it could not have violated the ADA. Then, Harris voluntarily dismissed the Allen Superior Court from his suit, so the district court dismissed his case.

Harris's appeal from the summary judgment dismissal of the Allen County Board of Commissioners is before us now. We review *de novo* the district court's conclusion that the Board was not Harris's employer under the ADA, making reasonable inferences in favor of Harris where appropriate. *See Tindle v. Pulte Home Corp.*, 607 F.3d 494, 495–96 (7th Cir. 2010).

## II. ANALYSIS

The ADA imposes liability on employers who discriminate in the terms and conditions of a qualified individual's employment on the basis of a disability and requires that employers make reasonable accommodations for qualified individuals' disabilities. 42 U.S.C. § 12112(a), (b)(5)(A) (2009) (respectively).

Accordingly, to bring this ADA claim against the Allen County Board of Commissioners, Harris must show that the Board is his employer. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d

697, 701 (7th Cir. 2015). Harris admits that the Allen Superior Court is his direct employer, but he asserts that the Allen County Board of Commissioners should be considered his indirect, or de facto, employer. Indeed, a plaintiff can bring a discrimination claim "under certain *limited* circumstances" against a defendant who is not his direct employer. *Id.* at 701 (emphasis added); *see also Smith v. Castaways Family Diner*, 453 F.3d 971, 975–76 (7th Cir. 2006) (construing similar provisions of various antidiscrimination statutes together); *Chi. Reg'l Council of Carpenters v. Pepper Constr. Co.*, 32 F. Supp. 3d 918, 923 (N.D. Ill. 2014) (analyzing whether a defendant was an employer under the ADA).

To determine whether a defendant can be held liable as an indirect employer, we examine the degree of control the putative employer exercises over the plaintiff and the "economic realities" of the relationship. *Love*, 779 F.3d at 702. Courts typically employ a five-factor test to aid in this analysis, *id.* at 702; *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991), but those "factors are simply a more detailed application of the economic and control considerations present in the 'economic realities' test," *Love*, 779 F.3d at 702. Moreover, under any version of the test, the most important question is whether the putative employer exercised sufficient control over the plaintiff. *Knight*, 950 F.2d at 378; *Love*, 779 F.3d at 705 ("Based on our application of the five-factor test, Love cannot demonstrate that Cullen 'so far controlled [his] employment relationship'" as to make Cullen his de facto employer.) (alteration in original) (quoting *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995)).

Here, then, we focus on the most important considera-
tion—the employer's exercise of control—instead of laying
out the five-factor test. The parties have done the same.

An employer-employee relationship is likely to exist "[i]f
an employer has the right to control and direct the work of the
individual," *Love*, 779 F.3d at 703 (alteration in original) (quot-
ing *Alexander v. Rush North Shore Medical Ctr.*, 101 F.3d 487, 493
(7th Cir. 1996)). Generally, the key control powers are "those
of hiring and firing." *Id.* (quoting *EEOC*, 69 F.3d at 171). An
employer's control over other aspects of the employment re-
lationship may be relevant, though, if that control is related to
the subject of the plaintiff's suit. *See Tamayo v. Blagojevich*, 526
F.3d 1074, 1088–89 (7th Cir. 2008) (permitting the plaintiff's Ti-
tle VII and Equal Pay Act claims to proceed toward trial when
she alleged, in part, that the putative employer "controlled
her salary—the basis of her alleged adverse employment ac-
tion").

Harris contends that he has presented enough evidence to
create a triable issue as to whether the Board sufficiently con-
trolled his employment—particularly with regard to the sub-
ject of his suit—as to make it his de facto employer. The ma-
terial facts pertinent to that contention, detailed in Section I,
are undisputed. *See Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–
77 (7th Cir. 1996) (noting that we consider the same record as
the district court and evaluate the evidence in the record to
determine whether there are any genuine disputes on mate-
rial facts). The parties simply disagree about whether those
undisputed facts conclusively establish that the Board was
Harris's employer. Thus, this dispute presents a mixed ques-
tion of fact and law, which "may be resolved on summary

judgment if a reasonable trier of fact could reach only one con-
clusion." *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir.
2002) (quoting *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir.
1989)).

Because Harris has failed to present evidence that the
Board sufficiently controlled his employment, a reasonable
trier of fact could reach only one conclusion in this case—that
the Board of Commissioners was not Harris's employer for the
purpose of this suit.

Under Indiana's statutory scheme, the Allen County Board
of Commissioners had little, if any, authority to control Har-
ris's employment. Instead, the control of Harris's hiring, fir-
ing, day-to-day duties, and salary was statutorily delegated
to the Allen Superior Court. *See* Ind. Code § 31-31-8-3 (2009);
§ 33-33-2-14 (2008); *cf. Curl v. Reavis*, 740 F.2d 1323, 1327 (4th
Cir. 1984) (quoting *Calderon v. Martin County*, 639 F.2d 271, 273
(5th Cir. 1981)) (State law can be relevant to whether a plaintiff
is an employee under Title VII "insofar as it describes the
plaintiff's position, including his duties and the way he is
hired, supervised and fired.").[1] Allen County was given only
the ministerial duty to pay the Juvenile Center's expenses. *See*
§ 31-31-8-3(d).

Harris posits that his evidence creates a triable issue as to
whether the Board, despite the statutory scheme, controlled
certain aspects of his employment as to become his de facto

---

[1] Judge Heath of the Superior Court's Family Relations Division also
submitted an affidavit attesting (1) that the Court had not delegated its
power to hire and fire Harris to Allen County or its Board of Commission-
ers, and (2) that no one from the Board made the decision to either hire or
fire Harris.

employer. He points to (1) the payment of his wages and benefits by the county, (2) the various documents related to his employment that appear to identify the Board as his employer, and (3) Charity Murphy's close involvement in his disability accommodations and his termination.

None of this evidence demonstrates that the Board controlled Harris's employment.

The evidence that the Board paid Harris's wages and benefits cannot be understood as any measure of its control over him because the Indiana statutory scheme required that the Board pay the Juvenile Center's expenses, without any say in the matter. To the extent that the Board's payment of Harris's workers' compensation coverage and benefits may have been beyond its statutory requirement, that payment simply doesn't establish that the Board controlled Harris's employment as to make it his de facto employer for the purpose of this suit.

Further, many of the documents Harris points to as evidence of the Board's control are also consistent with its statutory requirement to pay. For example, it makes sense that Harris's job descriptions bear the Board's seal if they have been incorporated into the county's job classification system for payment purposes. And it makes sense that the form to begin receiving disability benefits would bear the name of the entity who is paying them. Given the statutory scheme, it would be unreasonable to infer from this evidence that the Board controlled Harris's employment. To be sure, the fact that Harris's job performance evaluations were titled "Allen County Employee Performance Appraisal," appears unrelated to Allen County's statutory duty to pay. But Harris presents no evidence or allegation that the Board, rather than the Superior

Court, used the document, or that the Board had the ability to terminate or discipline him if his performance evaluation was poor. In fact, Harris does not dispute that all of his discipline during his employment was handed down by the Superior Court. Thus, this document is not evidence of the Board's control, either.

Harris's strongest evidence that the Board may have controlled relevant aspects of his employment comes from Charity Murphy's close involvement in Harris's employment from the time of his disability through to his termination. Certainly, her involvement was more than the Indiana statutory scheme would require it to be. For example, Murphy told Harris that his work restrictions made him unable to return to his former position, offered him an alternative part-time position, worked with him to find other employment, and eventually informed him that he was terminated.

But none of Murphy's communications with Harris actually indicate that Murphy or the Board decided that his disability could not be accommodated, determined whether he received another job, or elected to terminate him, let alone indicate that she or the Board had the authority to make those decisions.[2] And in fact, in Murphy's October 17 letter, Murphy

---

[2] In his affidavit, Harris stated that, after he was terminated, he spoke to Chandra Reichert at the Superior Court about whether he would be paid for his remaining benefit days. He says that Reichert did not know he had been terminated and that she said, "downtown … handles that." We do not consider this evidence because it is inadmissible, and because Harris has given us no reason to think that it would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 987 (7th Cir. 2009) ("A court may consider only admissible evidence in assessing a motion for summary judgment.").

effectively tells Harris that she has no authority to hire him, telling him to let her know which jobs he applied to so she could contact the hiring official on his behalf. Moreover, it would be unreasonable to infer that Murphy or the Board had the ability to control these aspects of Harris's employment, given that Indiana's statutory scheme explicitly vests control over Harris's employment in the Allen Superior Court and that there is no evidence that would allow a trier of fact to find the reality was otherwise.

### III. CONCLUSION

In sum, Harris bore the burden of establishing an employment relationship between himself and the Allen County Board of Commissioners for the purpose of his ADA suit. To do so, he needed to establish that the Board had sufficient control over his employment as to make it his de facto employer. Pursuant to Indiana's statutory scheme, the Board of Commissioners had very little, if any, authority to control Harris's employment. We would need to draw unreasonable inferences from Harris's evidence of the Board's involvement in his employment to conclude that it nonetheless had, and exercised, sufficient control over his employment. We decline to do so.

Because Harris has failed to present any evidence that the Board generally controlled his employment, *see Love*, 779 F.3d at 703, or that it controlled those specific aspects of his employment related to the subject of his suit, *see Tamayo*, 526 F.3d at 1088–89, no reasonable factfinder could conclude that the Board was Harris's employer in this ADA suit. AFFIRMED.